[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case was referred to the Regional Family Trial Docket as a custodial dispute arising within a dissolution action.
The custodial issues were settled and the court agreed, in view of the facts of this case, to hear the balance of the dissolution.
After a full hearing, the court, based upon a preponderance of the credible, relevant and legally admissible evidence, finds:
The parties were married on November 26, 1977, the first marriage for husband and the second marriage for wife. Husband is aged 50, wife aged 45. Wife's health is good. Husband has high blood pressure and high cholesterol. Each resided continuously in this state twelve months preceding the filing of the complaint. The marriage has broken down irretrievably. None of the parties has ever received aid or assistance from the state of Connecticut or any town thereof. CT Page 5114-JJJ
Four minor children have been born to the plaintiff wife since the date of the marriage: Travis K., born August 5, 1979; Nicholas A., born December 4, 1980; Alexander S., born October 6, 1982 and Amanda L., born Dec. 2, 1986.
Husband graduated from Syracuse University with a bachelor's degree in economics in 1968. Wife is a high school graduate with one full year of college, who enjoys a robust intelligence quotient of 142.
Wife worked in clerical and bookkeeping positions until the birth of their first child. She has not been employed since except for occasional odd jobs, installing tile, painting and the like. In 1991, she was certified as an Emergency Medical Technician. She has been repeatedly recertified and will continue that tradition. Although EMT employment pays $8 to $10 an hour, Mrs. Maas uses those skills solely as a volunteer, working at least one twelve hour shift a week without compensation and, from time to time, additional shifts.
Mrs. Maas could upgrade her skills to paramedic by taking a one and a half year course at a cost of $3000 to $4000. As a paramedic she could earn $20 an hour: $20,000 for a twenty hour week, $30,000 for a thirty hour week and $40,000 if she chose to work full time. Mrs. Maas is requesting time limited alimony "to pursue further education and become financially independent and self-supporting." Yet, during the years following her filing for dissolution, while Mrs. Maas withdrew a total of $32,000 from her IRA and her annuity, demonstrating a financial capacity to have initiated paramedic training, had it been a priority for her, she did not do so. In addition, her weekly volunteer service with the community ambulance, for a minimum of twelve hours a week demonstrates that Mrs. Maas also had some time available for paramedic training, had it been a priority for her. Further, State Trooper David Slezak's presence in her home, after defendant father had been separated, offered Mrs. Maas the opportunity to have a supervisor for the children while she began her studies. No testimony was offered indicating that the Trooper, an eighteen year veteran with the State Police, with a seniority that suggests an ability to influence his work schedule, was unavailable.
Mr. Maas was employed by First Commodity Corporation prior to his marriage and until 1983. He earned a substantial income CT Page 5114-KKK during those years. By 1983, through savings and investments, he had accumulated approximately one million dollars. (That same pattern of savings through frugality and investment acumen enabled Mr. Maas to bring $17,000 into the marriage.)
He worked until 1986 when he returned to Connecticut and began a job search via resumes, interviews and newspaper ads. His only offer was from the Waterbury Chamber of Commerce, at $22,000 a year. That job lasted three weeks. Thereafter, Mr. Maas became semi-retired, focused on managing the family's investment portfolio, which produced $20,000 to $40,000 of taxable income a year, an income he supplemented by earning $12,000 a year as a consultant one week each month. The family lived conservatively, but comfortably.
Mr. Maas increased his family activities, spending more time with the children and assisting around the house. Mrs. Maas continued as a housewife, mother and community volunteer.
Mrs. Maas objected to her husband's management of the family investment portfolio without consulting her, though she did not object to the financial results he achieved. Their social styles, clearly disparate, caused them to drift. As they drifted, they each wandered socially and sexually, Mr. Maas in occasional, short term dalliances, Mrs. Maas in a more focused, continuing relationship with Connecticut State Trooper David Slezak. The drifting relationship was breached beyond reconciliation when Trooper Slezak became a fixture in Mrs. Maas' life. To that degree, Mrs. Maas must be said to have been the final and predominant cause of the breakdown of the Maas marriage.
But while Mr. Maas was candid about his relationships, neither Mrs. Maas nor Trooper Slezak, her live in lover, were credible as they attempted to purify their relationship and avoid the financial repercussions of seeking alimony while accepting Trooper Slezak as a financial contributor.
Although both Mrs. Maas and Trooper Slezak each went to great lengths to deny they engaged in a surreptitious relationship, defendant's exhibit 4, a love letter from David Slezak to Sharon Maas, which concluded with "Destroy this card appropriately" illuminated their secretive pattern, a pattern they continued throughout their courtroom testimony.
Trooper Slezak has lived with Mrs. Maas full time since April CT Page 5114-LLL of 1995. Their relationship is socially and sexually a married one, but each of them denies it is an economic partnership. They live in her home, on her assets. He has moved in his clothes, his dog, his automobile and his landscaping equipment. Mrs. Maas testified he contributes $25 to $50 a week to their food, as well as paying for occasional fast foods. Trooper Slezak stated he pays $125 to $150 a week for food, including fast foods. He contributes to the cost of their vacations and has extended membership benefits at his golf club to Mrs. Maas and the children.
Their tales of his limited financial role are not credible. Mrs. Maas claims a weekly shortfall of $624, or $32,448 per annum, yet she claims to have accepted Trooper Slezak as a rent free guest in her home and her bed. He earns $58,000 a year, continues to pay the mortgage on his empty home, has paid off several thousand dollars of credit card debt during his rent free stay with Mrs. Maas and has increased his savings by approximately $4,000 during that period.
Trooper Slezak testified that he has discontinued the fertilizer and landscaping business which added to his state police income in previous years. He continues to maintain his tractor, chipper shredder, tiler, brush whacker and dump truck, however. Though ordered to do so, he swore he could not produce his 1995 income tax return. He testified that he destroyed it after receiving a 1995 tax rebate in excess of $3000. Had that tax return been available to the court, it might have added some credibility to his improbable financial claims.
He pays his divorced wife $125 alimony a week.
His paramour, Mrs. Maas, is seeking alimony of $200 a week for five years and child support of $650 a week based upon her husband's substantial earnings during 1976 through 1983, rather than his quite modest income since 1986.
This court believes Mrs. Maas is making no reasonable effort to increase her own income by means of employment, nor by undertaking the available paramedic training to broaden and enhance her prospective employment, nor, if their testimony is to be believed, by requiring Trooper Slezak to pay his fair share of the cost of residing with Mrs. Maas and the children. This court also believes the Maas-Slezak union has been carefully choreographed to create as persuasive a case as they mutually can CT Page 5114-MMM for alimony and excess child support, all while swelling Trooper Slezak's assets for their mutual future. Neither the lack of credibility in their financial presentations, nor the rash of Mrs. Maas' signals to him as Trooper Slezak was asked financial questions while on the witness stand, developed confidence in the Trooper's replies. The court also recalls the need for Mr. Maas to seek a court hearing before Trooper Slezak provided any financial information.
A great deal of the court's time was spent pursuing Mrs. Maas' claim that her husband secreted and/or depleted assets. It is true that he did not produce all the financial information as rapidly as Mrs. Maas would have liked. The documents he did provide, however, were massive and impressed the court as sincere.
Two financial issues were settled to the court's satisfaction during the trial:
1. Ultimately, Mr. Maas provided his wife with all the available financial documentation she was entitled to. This was established when the court asked Mrs. Maas to choose any one of her claims for missing documentation and directed Mr. Maas to then lead her to the documents which he claimed to have provided and which she denied. On four successive occasions, in open court, pursuing four financial documents of Mrs. Maas' choice, Mr. Maas established that the documents Mrs. Maas claimed to be missing were, in fact, already in Mrs. Maas' hands or were unavailable for good cause.
2. Mrs. Maas then presented a four page listing of financial statements, Forms 1099, financial summaries and tax statements. Her claim was that Mr. Maas failed to satisfactorily explain the movement of funds through those accounts. The listing was massive. It included multiple accounts in ten different banks; twelve funds, accounts or trusts; three credit cards; two store accounts and one charge account. During his cross examination by counsel for Mrs. Maas, Mr. Maas said, after establishing 1, above, "I am prepared to answer any question on any of those forty-one line items." The court thereupon declared a recess, affording Mrs. Maas ample time to choose three questions calculated to establish her theme, that Mr. Maas was financially suspect. When we returned from the extended lunch break, the questions were never asked. CT Page 5114-NNN
Mr. Maas' management of the family's funds created both a steady rise in value and a comfortable, satisfactory standard of living since 1986. Though Mrs. Maas repeatedly raises a number of fact situations that concern her, the court found none of them to be founded in logic or fact. No family assets have been depleted or hidden. This court finds itself in full agreement with Judge Dennis Harrigan who twice found Mr. Maas to be a skillful manager of the family assets.
With regard to disclosure, Mrs. Maas still has not provided her most recent federal income tax return, 1993, and State Trooper David Slezak, in spite of a direct order of the court, did not provide his 1995 federal income tax return nor did he provide the records of a credit card account into which he claims to have transferred another account.
The court did find that Mr. Maas used marital funds to hire attorneys. Mrs. Maas is clearly similarly entitled. Hence the court grants Mrs. Maas' request for a $20,000 allowance to prosecute.
The court recognizes that Mrs. Maas withdrew $32,000 from marital funds during the separation, but there has been no credible evidence that those funds represented anything more than living expenses, for which Mr. Maas also invaded marital funds. No recapture is indicated.
As for alimony, Mrs. Maas' role in the final breakdown of the marriage, her lack of credibility in describing her current financial status, her calculatedly passive role as a potential wage earner, and the nature of her financial relationship with Trooper Slezak, lead the court to conclude that alimony for Mrs. Maas is not appropriate in this fact situation. Mr. Maas seeks none.
Having reviewed the evidence and the sworn financial affidavits of each of the parties in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, the following orders shall apply:
1. DISSOLUTION
Dissolution shall enter on the grounds of irretrievable breakdown. CT Page 5114-OOO
2. CUSTODY
The parties will share joint legal custody of the minor children in accordance with the Stipulation presented to and accepted by the court on July 22, 1996.
3. CHILD SUPPORT
a. Based upon his current weekly income of $444 per week, defendant father shall pay plaintiff mother $250 per week until Travis reaches his eighteenth birthday, whereupon the payments shall reduce to $210 a week until Nicholas reaches his eighteenth birthday, whereupon the payments shall reduce to $173 per week until Alexander reaches his eighteenth birthday, whereupon the payments shall reduce to $111 per week until Amanda reaches her eighteenth birthday, whereupon child support payments shall cease.
b. Both defendant father and plaintiff mother shall provide each other with an annual sworn affidavit setting forth their income from all sources with supporting documentation satisfactory to the affidavit recipient attached thereto.
c. As father's and mother's income change from time to time, modifications of child support may, of course, be sought.
3. CHILDREN' TRUST FUNDS
The assets now being maintained for the benefit of the children shall continue to be so maintained as follows:
a. Father shall act as Trustee of said funds with the sole discretion to invest, divest, plan and distribute same. He shall provide a quarterly accounting to the Mother, who shall also be consulted prior to any distribution being made. In the event of a dispute, father's decision shall be final.
b. As Trustee, father is empowered to access the funds for the children for:
1. Higher education (college and graduate school) tuition,
2. College room and board (not graduate school room and board, living expenses, books, fees, etc. CT Page 5114-PPP
3. Extraordinary or emergency medical treatment,
4. Other expenses mutually agreed upon by both mother and father.
c. Any funds not used as set forth above shall be distributed to the child, one half at age 30 and the balance thereof at 35, unless mutually agreed otherwise by both mother and father.
d. Father shall create one or more trusts or other estate planning vehicles for those funds with the intention of providing for the children's health, education and welfare which shall insulate said funds, to the extent legally permissible, from outside creditors, the IRS, etc., and shall further provide as follows:
1. If any child dies before age 35, any balance in the child's account shall be divided equally among the surviving children pro rata.
2. Children shall be responsible for any taxes due, by them or others, on the redemption of assets, investment return, etc., which taxes shall be paid out of the funds contained in that child's account.
3. Father, as trustee, may release funds in the event of an emergency (medical, etc.) after consultation with mother.
e. Both mother and father shall execute any legal instrument that may be required to effectuate the above.
4. REAL ESTATE
a. Plaintiff mother shall retain all of her interest in 66 Lantern Park, Southbury, Connecticut.
1. She shall pay the real estate taxes thereon, the homeowner's insurance, upkeep, repairs and all other expenses necessary to maintain the property.
2. Defendant father shall assume full responsibility for the home equity loan secured by the Lantern Park property pursuant to the terms and conditions of the note and shall hold plaintiff mother harmless therefrom. CT Page 5114-QQQ
3. If plaintiff mother sells the Lantern Park property prior to the home equity loan having been paid in full, defendant father shall forthwith pay same in full, provide other security for or otherwise satisfy said obligation so that plaintiff mother receives the proceeds from the sale as if there was no home equity loan secured by the property.
4. Defendant father may, at his option, refinance the existing home equity loan for a term not to exceed fifteen years. Plaintiff shall cooperate. The same conditions and terms for father paying off the loan as previously outlines shall apply.
b. Plaintiff mother shall retain her interest; free of any claim by defendant father, to the land in Tennessee.
1. Plaintiff mother shall assume payment and hold defendant father harmless from the taxes, upkeep and maintenance of said property.
c. Defendant father shall retain sole ownership and be fully responsible for all the expenses for the real property located at 350 Community House Road, Southbury, Connecticut.
5. ASSETS
a. The marital assets shall be evenly divided between the parties.
b. Plaintiff mother shall receive Lantern Park, valued at $214,000, the Tennessee property valued at $44,000, defendant father's assumption of full responsibility for the $100,000 equity line of credit encumbering her Lantern Park property as hereinbefore set forth, and so much of Fidelity funds, Providian, Schwab IRA transfer cash and cash investment accounts — all at their gross value, not their after tax value — as will accomplish the equal division.
c. Defendant father shall receive Community House Road, valued at $140,000, the cash value of his life insurance, his $3000 coin collection, cash investment accounts, Vanguard annuity, and so much of the Schwab IRA account and Fidelity IRA — all at their gross value, not their after tax value — as will accomplish the equal division. CT Page 5114-RRR
d. Both parties will cooperate in executing whatever documents are necessary to achieve the transfers.
e. Prior to the division thereof, the attorney's fees for counsel for the minor children, which both parties found to be fair and reasonable, shall be paid forthwith from the marital assets.
6. PERSONAL PROPERTY
Each party shall retain the furniture, furnishings and miscellaneous personal property now in their possession but for the following items which defendant father shall transfer to plaintiff mother: a blue vase and dictionary, a share of the educational and other records of the children and two pieces of the master bedroom suite. Mother shall return to father fifty photographs and copies of 8mm films he has already designated.
7. DEBTS
Each party, except as otherwise provided for herein, shall assume full responsibility for and hold the other harmless from the debts listed on their financial affidavits.
8. MEDICAL INSURANCE
a. Defendant father shall maintain the minor children on his existing health insurance, or its reasonable equivalent.
b. However, if that coverage becomes available for the minor children through plaintiff mother's or her new husband's employment, father may instead pay the premium for said medical insurance attributable to the minor children's coverage.
c. Each party shall pay one-half of the minor children's' unreimbursed and reasonably necessary medical, dental and health related expenses.
d. Connecticut General Statutes 46b-84 (d) shall apply.
9. LIFE INSURANCE
a. Defendant father shall continue to maintain his present life insurance, naming the children as primary and irrevocable beneficiaries. CT Page 5114-SSS
b. Plaintiff mother reported her health as good, and the assets being transferred to her herein will enable her to meet the cost thereof, therefore, mother shall secure $75,000 of life insurance naming the minor children as primary irrevocable beneficiaries.
c. The obligation for each parent to maintain said life insurance coverage shall terminate upon the eldest child reaching age eighteen.
10. DEPENDENCY EXEMPTION
a. Defendant father shall declare all four children as dependants for state and federal income tax purposes for 1994 and thereafter.
b. Plaintiff mother shall declare all four children for 1993.
c. Each of the parties shall execute whatever documents are necessary to allow the declarations set forth above.
11. MOTOR VEHICLES
Each party shall retain ownership of and pay all expenses associated with their respective automobiles, and shall hold the other harmless therefrom.
12. ALIMONY
Neither party shall pay alimony to the other.
13. TAX LIABILITY
Defendant father shall assume and hold plaintiff mother harmless from any and all federal and state taxes, including penalties and interest thereon, incurred by the parties as a result of the filing of joint tax returns during the term of their marriage.
Joseph L. Steinberg CT Page 5114-TTT